# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6026 | **DATE** | 7/20/2001 |
| **CASE TITLE** | | Peterson vs. Massanari | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Plaintiff's motion to reverse the final decision of the Commissioner [18-1] is granted; the Commissioner's cross-motion for summary judgment [19-1] is denied. The ruling of the Commissioner's decision is reversed, and the case is closed and remanded to the Social Security Administration pursuant to sentence four of 42 U.S.C. sec. 405(g), for further proceedings consistent with this opinion. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | JUL 24 2001 date docketed | | 25 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | ED-7 FILED FOR DOCKETING | | |
| | Copy to judge/magistrate judge. | 01 JUL 23 AM 8: 58 | date mailed notice | |
| kf | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MICHAEL T. PETERSON,<br>    Plaintiff, | )<br>)<br>) |
| v. | )<br>) |
| LARRY G. MASSANARI, Acting<br>Commissioner of Social Security<br>Administration,<br>    Defendant. | )<br>)<br>)<br>)<br>) |

**Cause No. 99 C 6026**
**Magistrate Judge Geraldine Soat Brown**

DOCKETED
JUL 2 4 2001

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael T. Peterson brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits under the Social Security Act, 42 U.S.C. § 423 *et seq.*, and the Supplemental Security Income Act, 42 U.S.C. 1382(c)(3) (collectively the "Act"). Plaintiff has filed a motion to reverse the Commissioner's final decision, and the Commissioner has filed a cross-motion for summary judgment affirming the Commissioner's denial of benefits. [Dkt. ## 18, 19.] By consent of the parties under 28 U.S.C. § 636(c), this Magistrate Judge's Order shall be the final ruling on the motion. [Dkt. ##13, 14.] For the reasons set forth below, the Court GRANTS Plaintiff's motion, DENIES the Commissioner's cross-motion, and REMANDS this case for further proceedings.

## PROCEDURAL HISTORY

On January 6, 1997, a protective filing was made on behalf of Plaintiff by his mother,

Patricia Kilbeary, for Supplemental Security Income ("SSI") benefits. (R. 199.)[1] Subsequently on February 4, 1997, Plaintiff filed on his own behalf an application for Social Security disability benefits. (R. 44.) Plaintiff claimed disability due to depression, allergies/asthma, and back pain. (R. 32, 64.) The application for SSI benefits put the onset of disability at January 1, 1995. (R. 59.) Plaintiff's subsequent application for Social Security disability benefits put the onset date at October 2, 1996. (R. 44.)

The Commissioner denied Plaintiff's applications initially (R. 32) and again on reconsideration (R. 37), and Plaintiff requested an administrative hearing (R. 40). A hearing was held July 2, 1998 before the Administrative Law Judge ("ALJ") (R. 211), who denied Plaintiff's claims on July 10, 1998 (R. 11). On June 4, 1999 the Appeals Council denied Plaintiff's request to review the ALJ's decision, making the ALJ's determination the final decision of the Commissioner. (R. 7.) Plaintiff then filed the present lawsuit.

## BACKGROUND

Born April 2, 1970, Plaintiff was 28 years old at the time of the hearing before the ALJ in 1998. Plaintiff attended school to within one or two semesters of graduating from high school. (R. 194-198.) Throughout his schooling Plaintiff was placed in special education classes. (R.112-13, 147, 194, 215.) Plaintiff dropped out of high school twice and re-entered twice before dropping out for good in 1990 (approaching his twentieth birthday) when he learned he would have to repeat his senior year. (R. 106, 194, 196.) A 1996 psychological examination indicated Plaintiff reportedly suffered from learning disability and attention deficit disorder that had hampered his school performance. (R. 15, 112-13.) He underwent intelligence testing during this 1996 psychological

---

[1] References ("R.") are to the certified administrative record prepared by the Commissioner and filed with this Court pursuant to 42 U.S.C. § 405(g).

examination. The tests indicated Plaintiff had borderline to low average intelligence. (R. 114.)

Plaintiff has a work record dating back to before he left high school (R.113), yet apparently Plaintiff never stayed in a job more than a few months, and more typically quit or was fired from jobs within a few weeks of starting employment. (R. 23, 48-58, 116, 147, 190, 218, 229, 232, 238.) In the two years prior to his claimed January 1995 onset of disability, Plaintiff held at least six jobs in 1993 and four jobs in 1994. (R. 56-57.) In the period following the claimed January 1995 onset of disability, Plaintiff went through at least six jobs in 1995, and at least two or three jobs in 1996. (R. 57-58, 106, 147.) The exact number of jobs Plaintiff held during this period is uncertain because Plaintiff indicates he also did various work "for friends," for which there are no Social Security earnings records. (R. 55-58, 113.) Plaintiff testified at the July 1998 hearing that he had not worked since a job at an electrical supply store in approximately November 1996. (R. 147, 216-17.)

Given this transient employment record, a vocational expert retained by the Social Security Bureau of Disability Determination testified at the hearing that technically speaking, Plaintiff "has no vocational history," because he has not held any job for at least six months, which is required to qualify Plaintiff as having engaged in "substantial gainful employment." (R. 245.)

After high school Plaintiff lived with a woman, whom he married in 1992 and who left him in 1995 apparently without ever officially divorcing him. (R. 44, 46, 106, 215.) According to Plaintiff's mother, during their time together Plaintiff's wife purportedly kept after Plaintiff to look for work, but had to fill out his job applications for him because of his limited ability to read and write. (R. 85.) Plaintiff returned to living with his parents after he and his wife separated, and Plaintiff's mother filled out his disability application forms and was the principal source of information for various medical and psychological examinations Plaintiff underwent in relation to his disability filing. (R. 61, 121, 147.)

3

During the period after returning to live with his parents Plaintiff claimed to socialize with friends, pursue interests such as playing the guitar, and claimed to have dated. (R. 148.) However, the evidence also indicates Plaintiff spent much of his time sleeping or sitting alone in his room reportedly doing nothing. (R. 221, 231.) His claimed friends were described at the hearing as almost exclusively teenagers from the neighborhood (R. 228), with whom he occasionally played computer games (R. 222), and who mocked his slow-wittedness (R. 227-28, 240).

Plaintiff (or, more accurately, Plaintiff's mother) characterized his disability in his initial application form as: "I cannot sleep. I get headaches. I fell in gym and hurt my back." In the margin of the application a Social Security Administration interviewer pencilled the additional words: "allergy, asthma, depression." (R. 64.)

Evaluations by treating and examining professionals.

The evaluations of medical doctors, psychiatrists, and psychologists who actually examined Plaintiff diagnose Plaintiff variously as:

**a)** learning disabled, needing group therapy for related anxiety and a "job coach" to help him learn the routine of any new job (R. 118-19);[2]

**b)** suffering from perennial allergic rhinitis with secondary sinusitis and sporadic back pain, predominantly muscular in origin (R. 123);[3]

---

[2]  January 21, 1996 report of Diane F. Mittlehauser, Psy.D., and Elizabeth Siemens, M.A., of Educational Services of Glen Ellyn (Illinois). Plaintiff underwent a comprehensive psychological evaluation by this testing service at the referral of an Illinois state agency to which Plaintiff had applied to enter a rehabilitation program. (R. 112.) Plaintiff applied for admission to this rehabilitation program and was denied, after which he submitted his applications for Social Security disability benefits. (R. 85, 112, 125.)

[3]  March 18, 1997 medical evaluation of Vinod G. Motiani, M.D., to whom Plaintiff was referred for a physical examination by the Social Security Bureau of Disability Determination Services. (R. 121.)

**c)** having an "adjustment disorder of adult life" and anxiety disorder, with a history of learning disabilities, asthma/hay fever, and chronic back problems (R. 125);[4]

**d)** having a disorder of "written expression," as well as a paranoid personality disorder, back pain complaints and allergies, occupational underachievement and educational deficits, and global assessment of functioning significantly below the norm, with a poor self-image, feelings of being vulnerable and frequently misunderstood, and a pattern of either quitting or being terminated from jobs due to difficulties in tolerating frustration and due to chronic misinterpretation of the words or actions of others (R. 152);[5]

**e)** suffering major depression, single episode, moderate, with attention deficit disorder (R. 174);[6]

**f)** suffering from bipolar disorder, depressed, with possible attention deficit disorder (R. 192), a history of quitting a job if he is laughed at by co-workers, and complaints that his friends make fun of him (R. 190).[7]

---

[4] April 11, 1997 psychiatric evaluation of Joseph Martin Nemeth III, M.D., to whom Plaintiff apparently also was referred for examination by the Social Security Bureau of Disability Determination Services. (R. 124.)

[5] July 9, 1997 psychological evaluation of Darrel Snyder, Ph.D., of Psychodiagnostics, Ltd. in Chicago, Illinois. This examination also was made at the request of the Social Security Bureau of Disability Determination Services. (R. 146.)

[6] December 29, 1997 report of Suhail E. Ghattas, M.D., of West Suburban Multi-Specialty Services Association, S.C., Elmhurst, Illinois, a private physician from whom Plaintiff sought treatment. (R. 174.) Through this clinic Plaintiff commenced taking the anti-depressant medication Zoloft. (R. 190-91, 224.)

[7] June 1, 1998 report of Timothy M. Cullinane, M.D., also of West Suburban Specialty Services Assoc., Dr. Cullinane indicated Plaintiff now was taking twice as much Zoloft as was prescribed initially, and in addition was taking lithium. (R. 191.) The increased medication had commenced only recently, and Dr. Cullinane indicated he could not make a "full assessment" until Plaintiff came for his next appointment. (R. 191.) Dr. Cullinane stated that Plaintiff could seek employment on July 1, 1998, a month after the date of his report.

<u>Evaluations by SSA consultants for residual functional capacity</u>.

Non-treating physicians and psychologists engaged by the Social Security Bureau of Disability Determination Services reviewed the above reports of treating and examining professionals to assess Plaintiff's physical and mental "residual functional capacity." These Social Security Administration consultants rendered the following opinions in contrast to the opinions rendered by the treating and examining professionals.

**a)** Plaintiff had a history of allergies and muscular back pain, but no limitations on his ability to perform physical exertion except postural limitations on the frequency of stooping, no limitations relating to dexterity or vision, no speech or hearing impediments, and no environmental limitations except the need to avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation, etc. (R. 127);[8]

**b)** Plaintiff had no significant mental limitations except a moderate limitation of his ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual, and to set realistic goals and make plans independently of others. (R. 135.) This purportedly left Plaintiff with the ability to perform simple tasks. (R. 136.) In addition, Plaintiff showed no symptoms of any mental impairment except adjustment problems associated with anxiety that moderately restricted Plaintiff's activities of daily living, caused Plaintiff only slight difficulties in maintaining social function, seldom interfered with his ability to concentrate and complete work tasks in a timely manner, and for which there was insufficient evidence to determine whether Plaintiff experienced episodes of deterioration or decompensation that caused him to withdraw from

---

[8] April 18, 1997 physical assessment by Virgilio Pilapil, M.D., SSA medical consultant. (R. 126-33.)

a work situation or otherwise show poor adaptive behavior (R. 137-45);[9]

  c) Plaintiff was said to show limitations resulting from mental retardation and personality disorders (R. 164) that markedly limited his ability to understand, remember, and carry out detailed instructions, moderately limited his ability to concentrate for extended periods, work in coordination with or proximity to others, accept instructions and criticism from supervisors and get along with co-workers, or set realistic goals or make independent plans. (R. 160-61.) Nevertheless (based on the report of a telephone interview with Plaintiff conducted by an SSA representative) Plaintiff had a reasonable range of functioning intellect and sufficient mental capacity to do simple, unskilled work (R. 106-07, 160-62), despite indications in the clinical records that Plaintiff had a disorder of written expression, maladaptive personality traits including pathologically inappropriate suspiciousness and hostility, and paranoid personality disorder (R. 164-170).[10]

Testimony at the hearing.

  At the hearing the ALJ heard testimony by Plaintiff, his mother, Cheryl R. Hoiseth, a vocational expert, and Tammy Stohl, a woman of undetermined age, who had been "taken in" by Plaintiff's parents to live with the family two years previously and who described herself as Plaintiff's best friend. (R. 211-53.) Plaintiff testified that he had last worked three years previously as a driver, a job that he held for two to three months. (R. 216.) After that, he testified, he looked for work but was not able to find any. (R. 217.) Previously, he had not had any jobs that lasted longer than six months. (R. 217-18.) He testified that because of back pain he could stand for 15

_____

[9] April 21, 1997 mental assessment by Bronwyn E. Rains, M.A., countersigned by Carl Hermsmeyer, Ph.D., SSA psychology consultants. (R. 136.)

[10] August 25, 1997 mental assessment by William Spriegel, M.D., SSA medical consultant. (R. 162.)

minutes, but not 30 minutes (R. 218), and could sit for a half an hour. (R. 219.) He did not know how much he weighs, the names of the medications he takes, or the name of his doctor. (R. 219-20.) He testified that he takes out the garbage and vacuums, but that his mother will not let him dust or drive her car for more than five minutes. (R. 220-21.) He sometimes visits friends in the neighborhood to play a computer game. (R. 222.) The ALJ asked Plaintiff a number of questions about alcohol use. Plaintiff testified that he used to drink in the past but he never "got crazy," although drinking made him feel bad. Most of the time he does not drink at all. (R. 222-23.) He also testified that he often starts things that he does not finish and he gets into arguments with people. He also has bad allergies. (R. 223.)

Plaintiff's mother testified that Plaintiff had been on Ritalin but it made him jittery, so he takes Zoloft. (R. 225.) At the time of the hearing he had lived with his parents for almost four years. Plaintiff and his wife separated because of fighting over his inability to hold a job. Plaintiff's mother testified in response to the ALJ's questions that Plaintiff does not have a drinking problem, in part because he does not have any money to buy any alcohol, and that alcohol had not created any problems for Plaintiff at work. (R. 225-26.) She confirmed that Plaintiff has had problems with allergies all of his life. One of his big problems is that he misses work because he lacks a sense of how long it is going to take him to get ready and get to work. (R. 226.)

Ms. Stohl confirmed that Plaintiff's testimony was accurate based on her two years of living with the family. (R. 227.) She also testified that Plaintiff's "friends" are teenagers, 13 to 17 years of age, possibly 21 at most, who tease him. (R. 227-28.) She testified that Plaintiff acts at different age levels, all much younger than his real age. For example, he locks himself in his room and plays with toys, such as matchbox cars. (R. 243.) Plaintiff told her that he felt that he was a child trapped in a man's body. (R. 228.)

8

Under questioning by his attorney, Plaintiff testified that he had problems on the job understanding his boss giving him instructions. (R. 228.) He said that he quit his previous jobs because he "felt out of place" when people said he wasn't doing the job right. (R. 229.) "Almost every day" he stays in bed trying to decide if he wants to get up. (R. 229.) He was late for work but doesn't remember how often. (R. 230.) He has trouble remembering things and relies on his mother for even small things he has to remember. (R. 230-31.) He sits in his room doing nothing almost every day. (R. 231.) He doesn't like people because they make fun of him. (R. 232.) He testified that he tries to pay attention but he just doesn't seem to remember everything. (R. 233.) He will quit a job if he feels like he is not doing a good job rather than be fired. (R. 238.) He has a problem of bedwetting that he has had all of his life. (R. 234.) He testified that he has a short temper, gets frustrated, and feels depressed. (R. 234-36.) He confirmed that he had told Ms. Stohl he felt like a child trapped in a man's body. (R. 234.)

As noted above, vocational expert Cheryl R. Hoiseth testified that, because Plaintiff had not held a job longer than six months, he had effectively no vocational history. (R. 245.) Responding to hypotheticals propounded by the ALJ based on the functional capacity assessments of the non-treating SSA consultants (specifically, Ex. 4F (R. 126-33), Ex. 5F (R. 134-36) and Ex. 8F (R. 160-63)), the vocational expert concluded that Plaintiff was able to perform various jobs such as assembler, hand packager, and bagger. (R. 247.) The vocational expert said that if jobs requiring frequent interaction with co-workers or the public were eliminated from consideration, Plaintiff still could work as an assembler or hand packager, but not a bagger. (R. 247.) However, when the ALJ asked the vocational expert to assess Plaintiff's ability to work if the vocational expert also considered in her evaluation Plaintiff's hearing testimony and the testimony of Plaintiff's mother and Ms. Stohl, the vocational expert concluded:

[T]o fully credit the testimony, it would preclude work. The claimant and other witnesses have indicated that the claimant sleeps most of the day, doesn't go out very much, can't attend or has trouble getting to the various jobs that he's held, [and] can't seem to keep to the schedule. They reported that he has [a] short temper and gets into difficulties with other workers, gets into arguments with other persons on (inaudible) basis. They reported concentration problems and those are the main things that I would indicate would have the most limiting [effect].

(R. 248.)

## DISABILITY DETERMINATION PROCESS

The Social Security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520 and 416.920 (1999). The Commissioner must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *Id.*; *see also, Young v. Secretary of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A finding of disability requires an affirmative answer at either step three or step five. A negative answer at any step (other than step three) precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps one to four, after which the burden shifts to the Commissioner at step five. *Id.*

When a claimant for disability benefits cannot be found disabled based upon medical considerations alone, the Social Security Administration has established the Medical-Vocational Guidelines ("the Grid") in order to assess a claimant's ability to engage in substantial gainful activity.[11] *See* 20 C.F.R. Part 404, Subpart P, App. 2 (1999). The Commissioner's analysis at step

---

[11] The Grid is a chart which classifies a claimant as disabled or not disabled, based on the claimant's physical capacity, age, education, and work experience. The Grid was promulgated to

five typically involves an evaluation of the claimant's residual functional capacity ("RFC") to perform a particular category of work (i.e. sedentary, light, medium, heavy, or very heavy work), in combination with an application of the Grid to determine whether an individual of the claimant's age, education, and work experience could engage in substantial gainful activity. 20 C.F.R. Part 404, Subpart P, App. 2.

If use of the Grid is appropriate, the Commissioner may rely upon it for determining disability, and the Grid alone suffices as substantial evidence to uphold the decision of the Commissioner. *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). However, the use of the Grid is inappropriate if the claimant suffers from severe non-exertional impairments that prevent the claimant from performing the work indicated by the Grid.[12] *Id.* at 640-41.[13]

The determination as to whether use of the Grid is appropriate is a question of fact, and the Commissioner's decision to use the Grid will be upheld if substantial evidence supports its application. *Id.* at 641. "To uphold the ALJ's finding that the grids may be used in a given case, we [the district court] require only that there be reliable evidence of some kind that would persuade a

---

simplify the process, and improve the consistency, of disability determinations. These guidelines, however, are only to be applied when they accurately describe a claimant's abilities and limitations. *Heckler v. Campbell*, 461 U.S. 458, 462 n. 5 (1983). If a claimant's non-exertional limitations restrict the full range of employment opportunities at the level of work that he or she is capable of performing, use of the Grid is precluded. *Id.*

[12] A non-exertional limitation affects the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, or handle, and use of the fingers for fine activities. Such a limitation does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull. An exertional activity is any of the primary strength activities like sitting, standing, walking, lifting, carrying, pushing, or pulling. Social Security Ruling No. 83-10. *See Warmoth v. Bowen*, 798 F.2d 1109, 1110 (7th Cir. 1986).

[13] The fact that a claimant suffers from a non-exertional impairment does not automatically preclude utilization of the Grid. It is only when the non-exertional impairments are severe enough so that use of the Grid was not appropriate that the court will reverse a determination of non-disability based on the Grid. *Walker*, 834 F.2d at 641.

reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available." *Walker*, 834 F.2d at 641 (quoting *Warmoth v. Bowen*, 798 F.2d 1109, 1112 (7th Cir. 1986)).

When the Grid cannot be used to assess whether the claimant is capable of doing substantial gainful activity, other reasonable evidence must be relied upon to prove the claimant's employment opportunities are not significantly diminished. *Warmoth,* 789 F.2d at 1112. A vocational expert may be used by the Commissioner to assess whether there are a significant number of jobs in the national economy that the claimant can perform. *Id.*; 20 C.F.R. § 404.1566(e).

## ALJ'S DECISION AND PLAINTIFF'S OBJECTIONS

The ALJ determined that Plaintiff was not disabled as defined under §1614(a)(3)(A) of the Act, and was not entitled to disability benefits under §§216(i) and 223 of the Act. The ALJ concluded that Plaintiff had a residual functional capacity to perform at least a wide range of light work on a sustained basis. (R. 17.)

In accordance with the five step process, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since January 1, 1995. (R. 15, 18-19.) Although the ALJ did not make an explicit determination that Plaintiff satisfied step two, the ALJ identified Plaintiff's impairments and went on to make a determination at step three, and, therefore, by implication determined that Plaintiff had a severe impairment or combination of impairments. (R. 15, 18.) The ALJ further determined that Plaintiff's impairments considered singly or in combination did not meet or equal in severity any of the listed impairments, and, therefore, disability was not established at step three. At step four, the ALJ determined that Plaintiff was not able to perform his past relevant job as a delivery person. (R. 19.)

At step five the ALJ made a number of findings: that Plaintiff's testimony was not credible and not supported by medical evidence in the record; that Plaintiff is a "younger individual" with an unskilled work background; that Plaintiff has a limited education in special education classes; and that application of the Grid and the testimony of the vocational expert support a conclusion that Plaintiff can perform jobs that exist in significant numbers in the economy, including assembler, hand packager and bagger. (R. 19.) Accordingly, the ALJ concluded that Plaintiff was not disabled under 20 CFR §§ 404.1569 and 416.969, and 20 CFR Part 404, Subpart P, Appendix 2, Rule 202.17.[14]

Plaintiff argues that the ALJ erred as a matter of law in several respects. First, Plaintiff contends the ALJ erred in utilizing the Grid, which is not to be applied in cases involving primarily non-exertional impairments. (Pl.'s Mem. at 18 [Dkt. #18].) Second, Plaintiff contends the ALJ erred in posing a hypothetical to the vocational expert that did not require the expert to consider the degree to which Plaintiff's non-exertional impairments might limit the range of jobs he could perform. (Pl.'s Mem. at 19.) Third, Plaintiff argues that the ALJ erred in basing his determination on medical and psychological consultants' reports that failed to explain how the consultants reached their conclusions, and which were contradicted by the evidence of the specialists who actually examined Plaintiff. (Pl.'s Mem. at 20-21.) Fourth, Plaintiff contends that the ALJ erred in finding that Plaintiff lacked credibility, in that the ALJ failed to explain the basis for his credibility finding, and ignored without explanation independent evidence that confirmed Plaintiff's subjective complaints. (Pl.'s Mem. at 21, 23.)

The Commissioner's Brief in Response to Plaintiff's Motion and in Support of the

---

[14] 20 CFR Part 404, Subpart P, App. 2, Rule 202.17 defines a person as "not disabled" who is a younger individual, with limited education but able to read, who is capable of performing unskilled work.

Commissioner's Cross-motion for Summary Judgment [Dkt. #20] does not address specifically the Plaintiff's arguments that the ALJ committed various errors of law in reaching his decision. Instead, the Commissioner argues that substantial evidence supports the ALJ's determination. (Def.'s Mem. at 8, 12.)

## STANDARD OF REVIEW

The Social Security Act provides for limited judicial review of a final decision of the Commissioner (effectively that of the ALJ where, as here, the Appeals Council has denied the applicant's request for review). Where the ALJ commits an error of law, "reversal is required without regard to the volume of the evidence in support of the factual findings." *Imani v. Heckler*, 797 F.2d 508, 510 (7th Cir. 1986). With respect to the ALJ's conclusions of fact, the reviewing court's role is limited. There the role of the district court is only to determine whether the decision of the ALJ is supported by substantial evidence in the record. *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993). In reviewing the Commissioner's decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Brown v. Chater*, 913 F. Supp. 1210 (N.D. Ill. 1996). Thus, this court does "not substitute [its] own judgment for that of the ALJ." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). Rather, the court must affirm a decision supported by substantial evidence in the absence of an error of law. *Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir. 1990); *Edwards v. Sullivan*, 985 F.2d 334, 336-37 (7th Cir. 1993). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

# THE COMMISSIONER'S ROLE

When evaluating a disability claim the Commissioner (or ALJ) must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d 329, 333. Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or ALJ), not the courts. *Herr*, 912 F.2d 178, 181; *see also, Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible). Where there is a conflict between medical opinions, the ALJ may choose between those opinions but may not substitute his own lay opinion for that of the medical professionals. *Davis v. Chater*, 952 F. Supp. 561, 566 (N.D. Ill. 1996). A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

The district court is limited to determining whether the ALJ's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Secretary of Health and Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992). This does not mean that the ALJ is entitled to unlimited judicial deference, however. In addition to relying on substantial evidence, the ALJ must articulate his analysis at some minimal level and state his reasons for accepting or rejecting "entire lines of evidence," although he need not evaluate in writing every piece of evidence in the record. *See Herron*, 19 F.3d at 333; *see also, Young v. Secretary of Health and Human Servs.*, 957 F.2d 386, 393 (7th Cir. 1992) (ALJ must articulate his reason for rejecting evidence "within reasonable limits" in order for meaningful appellate review); *Guercio v. Shalala*, 1994 WL 66102, *9 (N.D. Ill. 1994) (ALJ need not spell out every step in his reasoning, provided he has given sufficient direction that

the full course of his decision may be discerned) (citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988).)

## ANALYSIS

Plaintiff's first contention, as noted above, is that it was an error of law for the ALJ to apply the Grid in making his determination because Plaintiff relies on primarily non-exertional limitations to support his claim of disability. However, Plaintiff claimed exertional impairments (bad back, allergies/asthma) as well as non-exertional impairments. It is the role of the ALJ to determine as a matter of fact whether Plaintiff's non-exertional impairments are so severe that they prevent Plaintiff from performing work the Grid indicates he is able to perform considering the severity of Plaintiff's exertional impairments. *Walker*, 834 F.2d at 641. On this question of fact, the Court is to defer to the ALJ's determination unless substantial evidence indicates to the contrary. *Wolfe*, 997 F.2d at 322.

However, the Court cannot determine whether substantial evidence supports the ALJ's election to apply the Grid, because, as Plaintiff correctly points out, the ALJ committed errors of law by ignoring key evidence and discounting Plaintiff's credibility, without explaining his reasons for doing so. If the evidence is appropriately analyzed and discussed by the ALJ, it may or may not support the ALJ's use of the Grid and his ultimate decision that the Plaintiff is not disabled. However, this Court cannot assess the validity of such decisions without some explanation of his reasoning by the ALJ.

A recent decision by the Seventh Circuit Court of Appeals underscores the necessity for the ALJ to explain why he has ignored or discounted key evidence. *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001). The ALJ's opinion in *Zurawski* contained the same flaws Plaintiff complains are

16

present in the ALJ's opinion in the present case. In *Zurawski*, the ALJ dismissed plaintiff's testimony as lacking credibility, but made no attempt to point out evidence in the record that would call plaintiff's testimony into question. *Id.* at 887. The ALJ also made a decision denying disability benefits (for a claimed back pain impairment) that referenced only the opinions of SSA consultants who never examined the claimant, but made no reference to opinions of examining physicians whose evaluations contradicted the consultants' opinions. *Id.* at 888-89.

The court in *Zurawski* cited the established rule that the court will not overturn the ALJ's credibility determination unless it is "patently wrong." *Id.* at 887. The court then cited Social Security Ruling 96-7p, which requires the ALJ to give specific reasons for a decision on credibility. The ALJ's credibility decision must be supported by other evidence in the record, and the ALJ must make his reasoning "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski* at 887, quoting Social Security Ruling 96-7p.

In *Zurawski,* the court noted in particular:

> [I]t is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."

*Id.* The ALJ in *Zurawski* rejected the claimant's complaints of disabling pain as being "'not entirely credible due to the inconsistencies with the objective medical evidence, and the inconsistencies with daily activities.'" *Id.* The *Zurawski* court found it could do no more than "ponder what exactly are these 'inconsistencies' because the ALJ provided no further explanation." *Id.*

In the present case, the ALJ's credibility finding is just such a single-sentence, conclusory statement as the court in *Zurawski* considered insufficient. In the present case, the ALJ stated only:

The testimony by the claimant as to his symptoms and their functional effects, when

evaluated using the criteria of Social Security Ruling 96-7p, was not credible or consistent with the objective findings (e.g., which fail to support a back impairment as alleged) or his daily activities which do not disclose physical or mental pathology of the degree represented.

(R. 16.) However, aside from his discussion of the examination of consultant Dr. Motiani (R. 15-16), the ALJ does not discuss what medical evidence is inconsistent with Plaintiff's complaints regarding his limitations due to his back pain.[15] Where a limitation is claimed to exist because of subjective reports of pain, the ALJ must "investigate all avenues presented that relate to pain, including claimant's prior work record information and observations by treating physicians, examining physicians, and third parties." *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.1994), quoted in *Zurawski*, 245 F.3d at 887. The ALJ's opinion does not reflect that investigation.

Because Plaintiff's counsel concedes that Plaintiff's claim is based primarily on his mental impairments (R. 251), it is even more significant that the ALJ does not describe the evidence of Plaintiff's daily activities that he believes contradicts Plaintiff's claim as to the degree of his mental pathology. The ALJ notes Plaintiff's self-reports about his occasional leisure activities, such as playing the guitar, fishing and reading comic books and Stephen King books. (R. 15.) However, the ALJ does not discuss why he believes that these activities make the Plaintiff's testimony about mental impairments incredible. In addition, the ALJ's description of even these activities appears to be overstated. For example, while the ALJ states that Plaintiff "occasionally" reads comics and Stephen King books (R. 15), the source for that statement is the report of Dr. Snyder (R. 146-59), which states that this reading is "seldom." (R. 148.) Likewise, the Plaintiff reported fishing only about twice a year, and playing cards only with his mother. (R. 148.) In *Zurawski*, the court concluded that the daily activities listed by the ALJ which supposedly contradicted the claimant's

---

[15] The ALJ does not discuss the finding in the Physical Residual Functional Capacity Assessment by Dr. Pilapil (Ex. 4F) that Plaintiff has some postural limitation. (R. 126.)

complaints were "fairly restricted," and "not of a sort that undermines or contradicts a claim of disabling pain." 245 F.3d at 887, citing *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000)(minimal daily activities do not establish that a person is capable of engaging in substantial physical activity). The same conclusion can be made about the few daily activities listed by the ALJ in this case.

The ALJ's opinion suggests that the ALJ believed Plaintiff was feigning forgetfulness. *See, e.g.,* ALJ's opinion at 18: "Unfortunately, the claimant was not helpful in his testimony in providing information on his earnings, asserting problems recalling the work." However, Plaintiff's testimony about his difficulties in remembering and following instructions, and his inability to recall previous employment, are objectively supported by the examining psychologists' reports of testing they conducted.[16]

Plaintiff also correctly points out that in dismissing the credibility of Plaintiff's own testimony, the ALJ makes no reference at all to the corroborative testimony from Plaintiff's mother and Ms. Stohl. (Pl.'s Mem. at 22.)

The ALJ's reference to SSR 96-7p, which describes the criteria for assessing credibility, also fails to meet the requirements of *Zurawski.* There the court noted: "It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms." 245 F.3d at 887. In the present case, the ALJ does not even describe the factors for assessing credibility, but merely cites the provision in the Regulations that governs such an assessment. The ALJ must demonstrate that he has followed the requirements of SSR 96-7p by specifying the evidence he considers as contradictory to Plaintiff's claims.

---

[16] The examining psychologist's report included the following results: Plaintiff's "long-term memory was significantly below average both on responding to test items and in reporting his personal history." (R. 115.) His score on long-term memory for names was kindergarten level, and his score on visual-auditory learning memory was first grade level. (R. 117.) Thus, the examiners concluded that "Michael has a great deal of difficulty with memory." (R. 118.)

The testimony of the vocational expert, Ms. Hoiseth, points out the importance of Plaintiff's (and the other witnesses') credibility. The vocational expert stated unequivocally that, if she were to credit the testimony of these witnesses at the hearing, she would have to conclude that Plaintiff is not capable of performing any substantial gainful activity. (R. 248.) In addition, it appears that the ALJ's determination that Plaintiff was not credible led him to discount the non-exertional limitations, which, in turn, presumably figured in his decision to apply the Grid.

Thus, this Court concludes that the ALJ erred as a matter of law in failing to explain properly his finding that Plaintiff's testimony lacked credibility, a critical finding in this case. There may in fact be a reasonable basis for his finding. If so, however, the ALJ has failed to provide the Court with information on which the Court can confirm his reasoning.

The ALJ's opinion similarly fails to advise the Court why the ALJ apparently ignored the broad sweep of evidence from examining psychiatrists and psychologists regarding Plaintiff's mental impairment. Apart from the blanket statement, "After carefully considering all of the evidence of record, I conclude that the claimant is 'not disabled.'" (R. 14), there is no discussion by the ALJ of significant parts of examining and treating professionals' reports. Since the ALJ does make reference to the reports of non-examining consultants, the Court must conclude that his neglect to cite certain critical parts of treating and examining professionals' reports indicates that he discounted the significance of–or perhaps ignored altogether–these reports.

The *Zurawski* decision again parallels the situation before this Court. The *Zurawski* court observed:

> It is worth repeating that "an ALJ may not ignore an entire line of evidence that is contrary to her findings," rather she must "articulate at some minimal level [her] analysis of the evidence" to permit an informed review. Here . . . the ALJ mentions only the medical evidence favoring the denial of benefits. And from her analysis, we are unable to discern whether she considered the record as a whole. . . . While we

have never required an ALJ to address every piece of evidence or testimony in the record, the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits. In this case, the ALJ's decision simply fails to permit an informed review, and therefore, a remand for redetermination of Zurawski's residual functional capacity is necessary.

245 F.3d at 888-89 (citations omitted).

As in *Zurawski*, this Court cannot discern whether the ALJ in the present case considered the record as a whole, or only considered the select evidence he referenced and interpreted as supporting his determination. The list of undiscussed evidence is long:

1.    The ALJ makes no attempt to include all of the diverse diagnoses—some apparently contradictory—that are listed in the various evaluations of Plaintiff: learning disability; adjustment disorder of adult life and anxiety disorder; disorder of written expression and paranoid personality disorder; major depression, single episode, and attention deficit disorder; bipolar disorder, depression, and possible attention deficit disorder. (R. 119, 123, 125, 152, 174, 190.)

2.    The ALJ does not state whether or how Plaintiff's long list of jobs, or the fact that he has held no job for as much as six months and accordingly does not even qualify as having a vocational history, figured in his evaluation.

3.    The ALJ makes no reference to Plaintiff's pattern of quitting jobs, often within as little as one week or less after being employed, nor does the ALJ appear to consider the significance of the mental status reports that tell of Plaintiff's pathological suspicions of co-workers, his difficulty comprehending job instructions, his outbursts of anger when co-workers ridicule him or criticize his work performance, or his conviction that employers are out to get him and he must quit jobs lest he be fired. (R. 107, 116, 125, 149-52, 190, 228-29, 232-36.)

4.    The ALJ makes no assessment of reports that, at 28, Plaintiff still is wetting his bed and

playing with toys, that Plaintiff spends much of his time shut up in his room, that Plaintiff's "friends" are teenagers half his age with whom he mostly plays computer games, that previously his wife and now his mother have to fill out application forms for him, that he is perceived to exist in "different age groups," acting one day like a 14-year-old and another day like a 17-year-old, with no predicability in his changes of behavior. (R. 221-22, 224, 228, 243.)

5.   The ALJ cites the report of the Plaintiff's treating physician, Dr. Cullinane, of an examination done on May 26, 1998, only six weeks before the hearing. The ALJ concluded that Dr. Cullinane "released" Plaintiff for work. (R. 16, 193.) However, the ALJ fails to discuss either the fact that Dr. Cullinane had started Plaintiff on a prescription of psychotropic drugs to treat bipolar disorder (Zoloft and Lithium) so recently that he expressly reserved judgment on Plaintiff's condition until a subsequent time, or the fact that the "release" was prospective to July 1, 1998, suggesting that Dr. Cullinane did not believe that Plaintiff was able to seek employment on the date that he examined him. (R. 190-91, 193.)

In addition to failing to discuss significant evidence in the record, the ALJ's opinion contains two further problems. First, the hypothetical questions posed by the ALJ to the vocational expert failed to take into consideration the limitations noted in the reports other than residual functional capacity evaluations by the SSA consultants. For example, the ALJ failed to mention the examining psychologist's conclusion that Plaintiff would need a "job coach" to learn any new job and would benefit from group therapy to adjust to any new working environment. (R. 119.) In *Mehaffey v. Apfel*, 81 F.Supp. 2d 952 (N.D. Iowa), the District Court for the Northern District of Iowa dealt with a similar situation. The claimant objected that the ALJ's hypothetical to the vocational expert failed

22

to include the limitation that the claimant would need considerable supervision or a job coach. The District Court remanded the case to the ALJ, noting that the Eighth Circuit has consistently held that questions posed to a vocational expert should set out precisely the claimant's physical and mental impairments. 81 F. Supp. 2d at 954. The failure of the ALJ's hypothetical to set out fully and fairly the level of supervision required by the claimant prevented the court from accurately determining whether the question (and thus the vocational expert's response) accurately reflected the claimant's abilities and limitations. *Id.* at 956.

The Seventh Circuit has held that where, as here, the vocational expert has reviewed the medical reports prior to her testimony, the question need not include every detail of the claimant's impairments. However, the hypothetical still must set forth the impairments to the extent they are supported by the medical evidence in the record. *Herron v. Shalala*, 19 F.Supp. 2d 329, 337 (7th Cir.1994). Here, as noted above, there appears to be a substantial discrepancy between the reports of the professionals who actually treated and examined Plaintiff, and the evaluations of the SSA consultants who looked only at the paper records to perform their residual functional capacity evaluation. By focusing the hypothetical only on the latter, the ALJ's hypothetical does not permit the court to determine whether the vocational expert's conclusion accurately reflected what work Plaintiff actually can perform.

Secondly, the ALJ's opinion suggests that the ALJ may have overemphasized the significance of drug or alcohol use in Plaintiff's condition. In his opinion the ALJ lists "polysubstance abuse" as one of Plaintiff's impairments. (R. 15.) However, the opinion cites no record reference for this conclusion, and there is nothing in any of the evaluations or the testimony to support the conclusion that Plaintiff suffers from a current alcohol or drug abuse problem. *See* Ex. 9F, indicating substance addiction disorders are "absent." (R. 170.) By referring to the

amendment to the Act precluding a finding of disability when drug and alcohol abuse is material, the opinion suggests that the ALJ believed that Plaintiff's previous job retention problems were related to a substance abuse problem, a belief for which there is no support in the record.

It is the Commissioner's duty, not the Court's, to resolve conflicts in the evidence such as are suggested by the evidence discussed above when compared to the selective evidence cited by the ALJ in his opinion. *Strunk v. Heckler*, 732 F.2d 1357, 1364 (7th Cir. 1984). Since the ALJ's opinion gives the Court no indication how, or whether, the Commissioner has carried out this duty to resolve conflicting evidence, the Court must follow the example of *Zurawski,* reverse the Commissioner's decision denying benefits, and remand the case for further proceedings. *Zurawski,* 245 F.3d at 890.

On remand, the ALJ is specifically instructed to review all of the evidence of Plaintiff's abilities and limitations, and, in particular:

(a) If the Commissioner intends to rely on the opinion of a vocational expert as the ALJ did previously, the ALJ shall include in any hypothetical question posed to the vocational expert reference to all of Plaintiff's impairments, limitations, and restrictions that are supported by the evidence. The ALJ must solicit the vocational expert's opinion as to whether and to what extent any special requirements indicated by the medical reports affect the prospect that there are jobs that Plaintiff can that exists in the economy in a significant number.

(b) If the Commissioner relies on the use of the Grid for a determination that Plaintiff is not disabled, the ALJ shall state specifically the basis for his conclusions that the Plaintiff's non-exertional limitations do not significantly limit the job opportunities otherwise available to Plaintiff, and that the use of the Grid is appropriate.

(c) The ALJ's determination regarding Plaintiff's credibility must contain specific reasons supported by evidence from the record as required by Social Security Ruling 96-7p.

24

## CONCLUSION

The Plaintiff's motion for summary judgment is GRANTED; the Commissioner's cross-motion for summary judgment is DENIED. The ruling of the Commissioner's decision is reversed, and the case is remanded pursuant to sentence four of 42 U.S.C. §405(g), for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**GERALDINE SOAT BROWN**
**United States Magistrate Judge**

**DATED:  July 20, 2001**